# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE ANN BRADDY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 1265 |
| | ) | |
| v. | ) | Magistrate Judge Cole |
| | ) | |
| CAROLYN W. COLVIN, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Stephanie Ann Braddy, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). 42 U.S.C. § 1382c(a)(3)(A). Ms. Braddy asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

Ms. Braddy applied for SSI on July 30, 2010, alleging that she was disabled due to post traumatic stress disorder, bipolar disorder, attention deficit hyperactivity disorder, manic depression, and pre-menstrual dysphoric disorder. (Administrative Record ("R") 224-227, 135). After her application was denied initially and upon reconsideration, she was granted an administrative hearing before an administrative law judge; she actually ended up having two. At the hearings, Ms. Braddy testified by phone and was represented by counsel. In addition, Dr. Ashwok Jilhewar and clinical psychologist A. Heineman testified as medical experts, and Jeffrey Lucas testified as a vocational expert. (R. 38, 52). On November 5, 2012, the ALJ determined that Ms. Braddy was not disabled because she retained the capacity to perform a restricted range of light work. (R. 19-32). The ALJ's

decision became the Commissioner's final decision on December 20, 2013, when the Appeals Council denied Ms. Braddy's request for review. (R. 3-10). See 20 C.F.R. §§404.955; 404.981. Ms. Braddy has appealed that decision by filing suit in this Court under 42 U.S.C. §405(g), and both parties consented to jurisdiction here pursuant to 28 U.S.C. §636(c).

## I.

## A.

### The Medical Evidence

Ms. Braddy saw Dr. John Bondy at the community clinic on April 12, 2010, where she had been referred after suffering spousal abuse. Her husband – who was by then incarcerated – had attempted to burn her and her clothes. She related complaints of mood swings, panic attacks, anxiety, sadness, racing thoughts. She had dreams about suicide but no such thoughts when she was awake. She had been experiencing 4-5 headaches a week over the prior 6 months. (R. 482).

Ms. Braddy followed up with Dr. John Bondy regarding her bipolar disorder on April 30, 2010. She reported stress regarding her mother requiring constant care. She stopped taking Klonopin. She was not sleeping well. (R. 480). On May 4, 2010, Ms. Braddy saw Dr. Bondy regarding anger outbursts. She reported that Abilify had reduced her migraines. (R. 478). On July 7, 2010, Ms. Braddy saw Dr. Bondy for a follow-up on her PTSD and depression. She was having difficulty sleeping, and she experienced panic-like attacks between 2-4 p.m. after which she would fall asleep.

The state disability agency arranged for Ms. Braddy to have a consultative psychological exam with psychologist Robert Watson on September 8, 2010. Ms. Braddy reported that she cared for her mother on the weekends. She said she had been married for two years, but had been

separated since less than two months after the wedding. Her husband set fire to a chair she was sitting in. She was married to another man before that, for seven years, and had three children with him. Her two youngest children did not live with her, but with her mother. She was currently living with a roommate and, prior to that, was living with her ex-mother-in-law until she got thrown out. She had been in jail before that for three months for committing battery while intoxicated. (R. 363). She claimed she stopped drinking in December 2008 after her brother's death in a motorcycle accident. (R. 363, 364).

Ms. Braddy said she last worked in 2009 cleaning a campground. She had to quit that job because she had no transportation and had to care for her ex-mother-in-law. Before that, she waitressed at a couple of restaurants and worked at a temp agency. (R. 364).

Ms. Braddy began going to counseling in December 2009. She said she had a breakdown in 2009 and began psychiatric treatment in the community health system. She said she had been diagnosed with PTSD, bipolar disorder, ADHD, PMDD and alcoholism. She was taking Abilify, Klonopin, Trazadone, and Paxil. (R. 364).

Dr. Watson reported that Ms. Braddy was anxious and depressed and her style of emotional relatedness was odd and uncomfortable. Ms. Braddy claimed to suffer blackouts and lose time. She had fairly regular dissociative episodes. She had severe difficulties with concentration and attention. (R. 364). She experienced hallucinations, which she thought were due to her medications. (R. 366). Upon examination, her immediate memory was only slightly impaired; her recent and remote memory were normal. (R. 365, 366). She could perform simple calculations. (R. 365). The doctor found she was becoming increasingly depressed and struggling to deal with traumatic events in her past. Her depression was significant, but probably secondary to her anxiety symptoms. She

3

demonstrated symptoms of panic, unstable mood, emotional numbing, hypervigilence, and dissociation. Dr. Watson opined that her capacity to perform work was moderately impaired. He diagnosed mild-moderate chronic depression, severe, chronic PTSD, and severe substance abuse. He assigned a global assessment of functioning ("GAF") score of 40, denoting "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgement, thinking, or mood (e.g., depressed man avoids friends, neglect family, and is unable to work, child frequently beats up younger children, is defiant at home, and is failing at school)." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. text revision 2000); *Yurt v. Colvin*, 758 F.3d 850, 853 (7th Cir. 2014).

On October 1, 2010, psychologist Lionel Hudspeth reviewed the file on behalf of the state disability agency. Dr. Hudspeth noted Ms. Braddy had moderate limitations in concentration, maintaining a schedule, accepting criticism and instruction, and getting along with co-workers, (R. 369-70). He thought that Ms. Braddy had sufficient cognition, memory, and thought processing skills for multiple step tasks. But, due to significant socialization problems, she should work in jobs with reduced work pressure and no contact with the public and minimal contact with co-workers and supervisors. (R. 371).

On October 2, 2010, Ms. Braddy sought treatment for lower back pain that radiated into her left leg. (R. 386). She was treated with Dilaudid, which relieved the pain. (R. 389-90). Lumbar spine x-rays revealed moderate degenerate facet arthropathy and mild osteophytic spurring, along with angulation of the distal sacrum. (R. 402). Ms. Braddy followed up a week later, but got tired of waiting to see a doctor and left. (R. 407-08). On October 12, she returned. One note from that

visit had her reporting that her pain had decreased over the previous 2 weeks (R. 422), while another stated it had gotten worse. (R. 423). The second was likely accurate, as examination revealed muscle spasm and decreased range of motion. (R. 426). She was sent home with prescriptions for Vicodin, Flexeril, and Ibuprofen. (R. 427).

On January 3, 2011, psychologist Leon Jackson reviewed Ms. Braddy's medical file for the agency. He felt that great weight could not be accorded the consultative examiner because he had seen Ms. Braddy only once. Still, Dr. Jackson said Ms. Braddy's complaints of panic attacks, crying spells, and recurring dreams were credible. She could perform simple, routine work with social limits. (R. 454). Dr. Frank Jimenez reviewed the file on January 13th and concluded that Ms. Braddy was physically capable of performing medium work, including lifting up to 50 pounds and carrying 25, and being on her feet for 6 hours of every workday. (R. 456-62).

Ms. Braddy sought treatment for severe headaches on January 14, 2011. She had had only two in the previous two years. An increase in her Klonipin prescription had alleviated her seizures, but these were replaced by migraines. There was some amnesia following the attacks. (R. 472). She followed up on her complaints of headaches and seizure on February 4, 2011. She reported a significant decrease in headaches and no seizures. (R. 469-70).

Ms. Braddy continued treatment for back pain on August 17, 2011. She was able to walk without difficulty and her motor strength was normal. (R. 468).

Ms. Braddy began therapy sessions with therapist Jennifer Hooker on April 8, 2010. She was suffering from depression and anxiety and reported a history of substance abuse, nightmares, and flashbacks. She said she had not used alcohol in the previous 13 months, but that she has noticed her symptoms increasing. She used cocaine from age 25 to 32. She had been arrested three times

5

– for battery in 2008 when she bit her mother while drunk, disorderly conduct in 2005, and DUI in 2007. She had been in a series of violent, abusive relationships, including that with her most recent husband, who set fire to her. She had tried to commit suicide in 1999 and 2001. She had trouble sleeping and concentrating. Ms. Hooker reported her attention, insight, and thought flow seemed normal, but mood was depressed. Ms. Hooker diagnosed PTSD and possible bipolar disorder, and assigned a GAF score of 50, which indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social occupational or school functioning ( e.g., no friends, unable to keep a job)." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. text revision 2000); *Farrell v. Astrue*, 692 F.3d 767, 769 (7th Cir. 2012).

Ms. Braddy returned on November 23, 2010. She reported she was feeling a little better, but she was still having dissociative experiences a few times a week. (R. 492). On December 9, 2010, she was upset because she had missed a probation appointment and her probation officer was threatening to have her sent to jail. She and Ms. Hooker discussed ways to build a routine and keep appointments. Ms. Braddy reported feelings of worthlessness and recent suicidal ideation, but the quality of her life and relationships had been improving. (R. 491).

On January 31, 2011, the two discussed the letter that Ms. Hooker had sent to Ms. Braddy's probation officer. She reported a decrease in mood lability. (R. 489). Ms. Braddy was jailed for a period following that meeting for having missed too many parole appointments. (R. 68-69, 627-31). On April 26, 2011, she reported anxiety due to her ex-husband being more involved in her life – her boyfriend was spending time with him. Still, she said her overall mood was good. (R. 487). On July 13, 2011, Ms. Braddy reported an increase in her symptoms. Her mood was up and down. She

had run out of Abilify. She was having more urges to return to substance abuse, but had not done so. (R. 486).

Ms. Braddy reported she had run out of Depakote on October 7, 2011, and was becoming very irritated. She was experiencing more periods of dissociation. She reported that her boyfriend continued to throw parties at their home. At one such occasion, she had a couple of beers but became sick due to medication. (R. 485). On November 17, 2011, she reported that she sometimes last track of time, but that her mood was more under control and she was using coping skills. (R. 484).

Ms. Hooker filled out a mental impairment questionnaire for the Social Security Administration on December 27, 2011. She reported that Ms. Braddy had a bipolar disorder. Her symptoms included memory impairment, and mood disturbance, and decreased need for sleep, all of which had improved with medication. (R. 634). There were also symptoms of decreased energy, sleep disturbance, easy distractibility, attacks of sudden and intense apprehension, and impulsive and damaging behavior. (R. 634-35). Medications caused side effects of sedation and decreased energy. (R. 635). Ms. Hooker felt that Ms. Braddy had no more than a moderate impairment in concentration, and only slight impairments in ability to maintain a schedule, interact appropriately with the public, and remember locations. She had no other restrictions. (R. 635-36). Ms. Hooker could not say whether she could hold down a full-time job. She hadn't had one or attempted to get one since therapy began. She was able to cook, clean, and take care of her mother on weekends. (R. 636).

The disability agency sent Ms. Braddy for another consultative psychological exam on January 20, 2012 – this time with psychologist David NieKamp. (R. 598-601). Ms. Braddy related

her symptoms, including sleep disturbance, angry outbursts, sadness, poor concentration, and bouts of severe apathy. (R. 599). After spending 45 minutes with Ms. Braddy, Dr. NieKamp said her symptoms matched criteria for moderate to severe depression and anxiety with PTSD features. He also diagnosed a dissociative disorder. He opined that these impairments would inhibit her ability to effectively find and maintain work. He assigned a GAF score of 40. (R. 601).

**B.**

**1.**

**The Plaintiff's Testimony**

Ms. Braddy testified that she was a high school graduate. (R. 102). She no longer drove, having gotten a DUI in 2007. (R. 102, 104). She was an alcoholic, but had quit drinking three years prior to the January 2012 hearing. (R. 98, 104). She talked about her dissociative disorder, how it caused her to sort of blackout and separate from herself. (R. 103). She got chronic migraines three or four times a week and had to lie down. (R. 105, 111). She couldn't sit for long periods of time due to her back problems. Her leg went numb sometimes and she had recently fallen because of it. (R. 105). But she couldn't get the appropriate treatment because she didn't have insurance. (R. 106). Her back pain was consistently at a 6 or 7 on a 10-point scale. (R. 109). She had trouble getting dressed; she couldn't bend over to tie her shoes. (R. 112). She worried about having dissociative episodes and hurting herself or others unintentionally. (R. 112-113). Consequently, she didn't leave home much. (R. 113). She discussed taking care of her mother-in-law. (R. 117). She and her husband had moved in with her for that purpose but, when her husband tried the set her on fire, his mother made them move out. (R. 118). More recently, she took care of her own mother on weekends. (R. 122).

Ms. Braddy related that, in the last 2-1/2 years, things deteriorated rapidly. (R. 117). She was referred for help by social services after a psychotic episode. She gained 70 pounds due to medications. (R. 117). She had weighed about 220 before that. (R. 120). She had panic attacks, even though she lived in a "very mellow house . . . [didn't] drink . . . [didn't] do drugs." (R. 126).

**2.**

**The Medical Expert's Testimony**

Dr. Jilhewar then testified as a medical expert. Summarizing the medical evidence, he noted that Ms. Braddy was morbidly obese, had migraine headaches that responded to medication, probable psuedo-seizures, degenerative arthritis in the back, and an old fracture of the left wrist. (R. 50-60). These impairments, individually or in combination, did not meet a listed impairment. (R. 60-61). Dr. Jilhewar felt that Ms. Braddy was limited to light work, with additional restrictions like not working on ramps, ladders, ropes, scaffolds, at unprotected heights, or moving machinery; performing more than occasional bending, stooping, kneeling, crouching, or crawling.

Dr. Heinemann then testified regarding Ms. Braddy's psychological impairments, also summarizing the evidence briefly. He noted that the GAF scores assigned to Ms. Braddy were quite severe, but that her impairments were described as moderate. (R. 64-65). He speculated that this may stem from the difference between a snapshot observance during a session and the demands of sustaining a 40-hour work week. (R. 66-67). Dr. Heinemann characterized Ms. Braddy's limitations in carrying out daily activities as mild, social functioning as moderate, and concentration as moderate. (R. 68). He opined that suffering from PTSD and anxiety could adversely affect one's ability to maintain a schedule and attend appointments, such as parole appointments. (R. 70).

**3.**

**The Vocational Expert's Testimony**

Finally, Jeffrey Lucas testified as a vocational expert. The ALJ began his questioning by posing a convoluted hypothetical, supposing that a person could perform light work that did not involve ladders, ropes, ramps, scaffolds, unprotected heights, heavy equipment, or operating machinery; could occasionally stoop, crouch, kneel, crawl, or balance; had moderate restrictions in social functioning and concentration that meant the work could involve no public contact, only occasional interaction with supervisors and co-workers; the work could not involve team coordination and had to be routine and simple. (R. 77-78). The vocational expert said that such a person could perform jobs like laundry worker, of which there were 470 positions in the state and 9,300 nationally, table worker (975 and 22,000 jobs), or addressing clerk (400 and 24,000). (R. 78-79). The person could be off task for about 8 minutes per day. (R. 80).

**II.**

**The ALJ's Decision**

On November 5, 2012, the ALJ determined that Ms. Braddy suffered from a number of severe impairments: bipolar disorder, post traumatic stress disorder, anxiety, substance abuse in remission, moderate degenerative arthropathy, lumbar degenerative arthritis, and extreme obesity. (R. 24). Despite these impairments, the ALJ found that Ms. Braddy was not disabled because she retained the residual functional capacity ("RFC") to perform light work that did not require her to use ladders, ropes, or scaffolds work at unprotected heights or operating machinery. She could only occasionally bend, stoop, crouch, crawl, kneel, or balance. She had moderate restrictions in concentration, persistence, and pace and in her ability to interact socially, so she was limited to

unskilled work that was routine and unchanging day-to-day, and that involved no public contact and only occasional contact with co-workers or supervisors. (R. 27). This RFC allowed her to perform jobs like laundry worker, table worker, or addressing clerk, which existed in significant numbers in the regional economy. (R. 31-32). Accordingly, the ALJ found her not disabled and not entitled to SSI. (R. 32).

## III.

## A.

### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is

required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It has also called this requirement a "lax" one. *Berger*, 516 F.3d at 544.

**B.**

**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920;

*Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990).  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44.  The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five.  *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

### Review of the ALJ's Decision

### 1.

Given the ALJ's treatment of reports from three psychological sources – two psychologists and a therapist – who happen to be the only three mental health professionals who examined Ms. Braddy – this case must be remanded.  All three assigned Ms. Braddy a GAF score that would suggest she is incapable of holding down a full-time job.  While it is true that GAF scores are not the be-all and end-all of a disability assessment, the problem here are the GAF scores in the context of the rest of the record.  *See Yurt*, 758 F.3d at 860 (". . . the problem here is not the failure to individually weigh the low GAF scores but a larger general tendency to ignore or discount evidence favorable to [plaintiff's] claim, which included GAF scores from multiple physicians suggesting a far lower level of functioning than that captured by the ALJ's hypothetical and mental RFC."); *Bates v. Colvin*, 736 F.3d 1093, 1099 n.3 (7th Cir. 2013)("We recognize that a low GAF score alone is insufficient to overturn an ALJ's finding of no disability. . . . In this case, however, taking the GAF scores in context helps reveal the ALJ's insufficient consideration of all the evidence ... presented.").

In this instance, there is a nearly lock-step consistency among the three mental health professionals regarding Ms. Braddy's capacity for work.  And it is not optimistic.  While the ALJ

rejected two of the assessments, the reasoning he gave for doing so does not bear scrutiny, and he simply ignored the third assessment. For these reasons, this matter must be remanded to the Commissioner for further proceedings.

The ALJ rejected the opinions of the three psychological sources that actually examined or treated Ms. Braddy. Notably, all three had assigned her GAF scores that seriously undermined a finding that she was capable of sustaining full-time employment. The two consultative examiners who examined Ms. Braddy on behalf of the disability agency, Dr. Watson and Dr. NieKamp, who saw Ms. Braddy in September 2010 and January 2012, respectively, both assigned her a GAF score of 40. As already noted, a score of 40 suggests a major impairment in several areas, resulting in avoiding family or an inability to work. *Yurt,* 758 F.3d at 859; *Campbell v. Astrue*, 627 F.3d 299, 302 (7th Cir. 2010). Ms. Hooker, the therapist who saw Ms. Braddy on a regular basis from April 2010 through December 2011, assigned her a score of 50, which was a bit more positive but still indicative of serious difficulties like an inability to have friends or maintain a job. *Williams v. Colvin*, 757 F.3d 610, 623 (7th Cir. 2014).

The ALJ discounted Dr. NieKamp's report because he inferred that it was based on Ms. Braddy's subjective account of her symptoms. (R. 29). That can be a valid reason to discount a medical opinion, *see Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008)*,* but in the case of a psychological consultative exam, there is not much else for a doctor to go on. There are no x-rays or MRIs to detect or gage the severity of PTSD or anxiety disorder. The psychologist must simply interview the subject and consider her responses in light of his or her training and experience. At times, the consulting psychologist will come away unimpressed with the subject and opine that they are exaggerating or are not credible. *See, e.g.,*

14

*Carter v. Colvin*, 556 Fed.Appx. 523, 527 (7th Cir. 2014). That was not the case here.

Moreover, Dr. NieKamp's assessment fell right in line with the previous assessment from Dr. Watson, and was in the same ballpark as that of Ms. Hooker. Consistency with the medical record is a factor that generally ought enhance the weight accorded an opinion. 20 CFR §404.1527(c)(4); *see Yurt*, 758 F.3d at 850; *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009). But here, the ALJ discounted Ms. Hooker's thoughts and ignored the opinion from the other consulting examiner, Dr. Watson. (R. 29-30). In fact, the ALJ didn't even mention it.

An ALJ need not mention every piece of evidence in the record, but he cannot ignore evidence that runs counter to his conclusion. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012); *see also McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011)(ALJ may not ignore opinion from a consulting state agency source). Dr. Watson's assessment certainly undermined the ALJ's decision, and the fact that Dr. Watson concurred with Dr. NieKamp undermined the ALJ's rejection of Dr. NieKamp's report. The ALJ could not simply ignore it. He had to discuss it and, if he still wanted to reject it, had to explain why.

The ALJ did discuss Ms. Hooker's evaluation. He seemed to discount it because she was only a therapist and hadn't seen Ms. Braddy in 12 months prior to the ALJ's decision. (R. 29). While she is not a psychiatrist or psychologist, she is an acceptable source of information regarding the severity of Ms. Braddy's impairments and the effect they have on her ability to work. 404.1513(d)(1). The fact that her assessment is similar to that of the only two other examining medical sources would seem to lend it additional credence. As for the fact that Ms. Hooker had not examined Ms. Braddy for 12 months at the time of the ALJ's decision, her assessment was one of the most recent in the record the ALJ had to consider. (R. 35-37). If the ALJ felt the evidence was

not sufficiently fresh, he could and should have sent Ms. Braddy out for further evaluations. He did, in fact, do that – Dr. NieKamp saw her in March 2012 – but we have seen how little he thought of that evidence.

**2.**

Along the way to rejecting the reports from Ms. Hooker and Dr. NieKamp, the ALJ makes some questionable comments regarding Ms. Braddy's credibility. He notes that Ms. Braddy did not seek treatment from medical sources for the indigent for nearly two years. (R. 29). It's unclear what period the ALJ is referring to. He cites records from April-August, 2010, and October 2010. (R. 29). There are certainly records of therapy sessions beyond that, through the end of 2011. Moreover, the ALJ did not address the reasons Ms. Braddy might have had for ceasing treatment – if, indeed, she did. As the ALJ noted, she is indigent, and she testified that her lack of insurance limited the types of treatment she could get. If he wanted to hold her lack of treatment against her, he had to "dig more deeply." *Pierce v. Colvin*, 739 F.3d 1046, 1050-51 (7th Cir. 2014).

Discussing Ms. Hooker's report, the ALJ said that she indicated that "to her knowledge, the claimant had not worked." (R. 29). The ALJ then pointed out that the "earnings record" showed that Ms. Braddy had worked, presumably referring to her stint cleaning a campground in 2009, and self-employment in 2006. (R.28, 29). But the ALJ mischaracterized or misunderstood what the therapist said. She actually said that Ms. Braddy "has never had a job or attempted to have one *since I've seen her.*" (R. 636 (emphasis supplied)). Ms. Hooker began seeing Ms. Braddy in 2010, months after her campground work in 2009. So Ms. Braddy hadn't worked or tried to while she was treating with Ms. Hooker, and the ALJ's assessment of the record was mistaken.

The ALJ also noted that Ms. Hooker relayed the information that Ms. Braddy cares for her mother on weekends, and submitted that this demonstrated some level of work-related functioning. He also referred to this while discussing Ms. Braddy's credibility, so it made no small impression on him. (R. 28-29). But time and again the Seventh Circuit has chastised ALJs about the difference between the ability to accomplish sporadic chores outside of a regimented work schedule and holding down a full-time, 40-hour-a-week job. *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014); *Roddy v. Astrue*, 705 F.3d 611, 639 (7th Cir. 2013); *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013). Moreover, Ms. Braddy takes care of her mother because she has to. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005)(caring for children).

The ALJ made another questionable assumption in assessing Ms. Braddy's credibility. He said that the record showed she was "attending parties" and that this ran against the idea that social contact produced anxiety for her. (R. 29). But the parties were thrown by her boyfriend, and took place at her house. Her report to her therapist that he "continued to throw parties" appeared to be more of a lament, when taken in the context of the discussions she had been having with her therapist about her negative environment and her boyfriend's association with her abusive ex-husband. (R. 485-87).[1] The gist of these reports also undermines the ALJ's statement that, as of November 2011, Ms. Braddy was in a stable environment. (R. 29). If she is living with a man who is partying with the man who tried to set fire to her, the environment would seem to be anything but stable.

---

[1] The ALJ also erred in finding that Ms. Braddy lied at her hearing when she claimed she had "quit drinking over three years ago." (R. 104). In fact, she had had two beers at a party in October 2009, but had gotten ill. This was apparently her only lapse in the 3-year period.

## CONCLUSION

The plaintiff's motion for remand [Dkt. # 32] is GRANTED, and the Commissioner's motion

for summary judgment [Dkt. #38]  is DENIED.

**ENTERED:** _____

**UNITED STATES MAGISTRATE JUDGE**

DATE: 2/4/15